Jennifer HOUSTON, Plaintiff,

v.

**MEDTRONIC, INC., a Minnesota corporation; Medtronic Sofamor Danek, USA, Inc., Defendants.**

**Case No. 2:13–cv–1679–SVW–SH.**

United States District Court, C.D. California.

July 30, 2013.

Cecilia Han, Kent L. Klaudt, Lisa J. Cisneros, Lieff Cabraser Heimann and Bernstein LLP, San Francisco, CA, Steven Elliott Fineman, Wendy R. Fleishman, Lieff Cabraser Heimann and Bernstein LLP, New York, NY, A. Illyas Akbari, Baum Hedlund Aristei and Goldman PC, Los Angeles, CA, for Plaintiff.

Michael Kevin Brown, Reed Smith LLP, Los Angeles, CA, for Defendant.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT [16]

STEPHEN V. WILSON, District Judge.

## I. INTRODUCTION

On March 8, 2013, Plaintiff Jennifer Houston ("Plaintiff") commenced this action against Defendants Medtronic, Inc., and Medtronic Sofamor Danek USA, Inc. (collectively, "Defendants"). Plaintiff alleges that she suffered harmful side effects after undergoing lumbar surgery in which her surgeon used Defendants' product, the Infuse Device, in an off-label manner. (Dkt. 1 ("Compl.") ¶¶ 1–13). Now before

the Court is Defendants' motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons below, the motion is GRANTED and the Complaint is DISMISSED with leave to amend.

## II. FACTUAL ALLEGATIONS

### A. Subject Device

Medtronic Sofamor Danek, USA, Inc. ("MSD"), a division of Medtronic, Inc., manufactures a medical device known as the InFUSE™ Bone Graft/LT–CAGE™ Lumbar Tapered Fusion Device ("Infuse Device"). (*See* Def. Req. Judicial Not. ("RJN"), Ex. B ("PMA")).[1] The clinical purpose of the subject device is to join vertebrae together and eliminate or reduce movement between vertebrae. (Compl. ¶ 50). Thus, physicians may use the Infuse Device in spinal fusion surgeries instead of implanting a patient's own bone or cadaver bone to form a bone graft. (Compl. ¶¶ 1–2).

Defendants' Infuse Device consists of two sub-components: (1) a metallic cylindrical cage ("LT–Cage™"); (2) the InFUSE™ Bone Graft, which is comprised of a liquid protein (rhBMP–2), and a collagen sponge carrier for the protein, both of which are placed inside the cage. (Compl. ¶¶ 55–56). The LT–Cage maintains the spacing between vertebrae and temporarily stabilizes the diseased region of the spine, whereas the liquid protein binds with the sponge to stimulate bone growth. (*Id.* ¶¶ 57–58).

### B. Premarket Approval

The Infuse Device is a Class III device under the Federal Food, Drug, and Cosmetic Act of 1938 ("FDCA"), as amended by the Medical Device Amendments of 1976 ("MDA"), a classification reserved for devices that pose the greatest risk of death or complications. (Compl. ¶ 64). For that reason, Defendants were required to obtain premarket approval ("PMA") from the FDA before it could sell or distribute the subject device. (*Id.* ¶ 65). Accordingly, Defendants filed a PMA application in 2001, submitting extensive clinical data and nonclinical studies to shore up the subject device's safety and efficacy. (*Id.*).

On July 2, 2002, the FDA granted premarket approval for the Infuse Device for spinal fusion procedures to treat degenerative disc disease. (RJN, Ex. A at 1). The FDA's approval letter stated that the Infuse Device may only be implanted (1) from the anterior (front) abdomen, and (2) placed within lumbar spine levels L4 through S1. (Compl. ¶¶ 72–73); (RJN, Ex. B at 1). In addition, the FDA approved labeling emphasizes that the InFUSE™ Bone Graft must not be used without the LTCage. (Compl. ¶ 74); (RJN, Ex. G at 1).[2] Thus, any operation that uses the Infuse Device in a manner inconsistent

---

**1.** Exhibit B to Defendants' Request for Judicial Notice is the FDA's Premarket Approval Letter for the Infuse Product. The letter is part of the pleadings by virtue of the incorporation by reference doctrine. The doctrine permits a court "to take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir.2005). Further, the document is judicially noticeable as a public document available on the FDA website, and therefore "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b); *see In re Amgen Inc. Sec. Litig.*, 544 F.Supp.2d 1009, 1023–24 (C.D.Cal.2008).

**2.** In July 2004, the FDA approved an expansion of the indicated spinal region from L4–S1 to L2–S1. The FDA subsequently also approved use of the InFUSE™ Bone Graft in certain tibia fractures and dental surgeries not relevant here. (Compl. ¶¶ 3, 72); (RJN, Exs. E, F).

with the above indication constitutes an "off-label" use of the device. Such off-label procedures include, for example, posterior lumbar spinal fusion (approaching spine from the back), cervical fusion surgeries (neck), or surgeries without the LT–Cage™. (Compl. ¶¶ 3, 77).[3] As described below, Plaintiff's claims stem from such an off-label use of the subject device. (*Id.* ¶¶ 1–3, 76–77).

## C. Plaintiff's Surgery

In October 2008, Plaintiff underwent a posterior-approach lumbar fusion at levels L4–L5–S1. Her physician performed the surgery using the Infuse Device in the following off-label manner: the device was implanted by means of a posterior, not anterior, approach, and an LTCage was not used. (Compl. ¶ 248).

Plaintiff alleges that prior to her surgery, Defendants did not inform her of any risks attendant to the use of the Infuse Device in the lumbar spine, nor did Defendants adequately inform Plaintiff's surgeon of the true incidence of uncontrolled bone growth resulting from the use of the device in off-label procedures, or of other risks or dangers or complications associated with the off-label use of the device. (*Id.* ¶¶ 37–38, 249, 254). Plaintiff further alleges that Defendants affirmatively engaged in a lengthy campaign of off-label promotion of the Infuse Device to physicians and spine patients, including Plaintiff and her physician, while "minimizing, concealing, and/or downplaying" the increased safety risks associated with off-label use of the subject device. (*Id.* ¶¶ 11, 23). In reality, however, Plaintiff asserts that Defendants knew, or had reason to know, at least a year prior to her surgery, of the "true risks and dangers to spine patients of off-label use of Infuse," including uncontrolled bone growth. (*Id.* ¶¶ 30–32).[4]

After her surgery, Plaintiff developed uncontrolled bone growth and resulting nerve compression near where the Infuse Device (in reality, only the InFUSE™ Bone Graft) was implanted. (Compl. ¶ 251). Plaintiff now suffers from bone overgrowth with nerve compression, chronic pain and radiculitis, and emotional distress and mental anguish. (*Id.* ¶ 256).

---

**3.** Later-approved PMA Supplements authorized additional, alternative cages, the "Inter-Fix" and the "InterFix RP." (RJN, Ex. D).

**4.** For example, Plaintiff points to: (1) a 1999 study using rhBMP–2 (the active ingredient in Infuse) in an off-label procedure (posterior lumbar surgery), sponsored by Defendants, which was halted when uncontrolled bone growth developed in multiple patients, in some cases necessitating remedial surgery (*id.* ¶ 80); (2) a 2002 FDA Advisory Committee Panel hearing, in which panel members cautioned Defendants to guard against off-label use of Infuse (*id.* ¶¶ 82–84); (3) a 2009 study finding that using bio-engineered proteins as bone grafts in anterior cervical fusion procedures resulted in an approximately 51 percent increase in complications, when compared to procedures using natural bone (*id.* ¶ 95); (4) a November 2006 article noting a significantly increased risk of swelling from off-label use of Infuse in cervical spine fusions compared to traditional fusion surgeries (*id.* ¶ 100); (5) two studies in 2007 finding the same effect of swelling in cervical procedures using Infuse (*id.* ¶ 101); (6) a July 1, 2008, Public Health Notification by the FDA, which strongly warned doctors that off-label use of Infuse and other bio-engineered bone proteins in cervical spine procedures could result in serious complications (*id.* ¶ 103); (7) a September 2008 news article in the *Wall Street Journal* stating that apart from cervical procedures, "a review of FDA records and medical literature shows there have been scores of other cases in which serious complications arose after [Infuse] was used in other off-label situations," and noting that at least three-quarters of adverse events involving Infuse reported to the FDA involved off-label use of the device (*id.* ¶ 105); (8) a 2012 article by FDA researched Emily Woo, concluding that off-label use of Infuse accounts for 99.5 percent of adverse events (*id.* ¶ 111).

She has undergone multiple revision surgeries to attempt to remove the bone overgrowth. (*Id.* ¶ 257). Plaintiff asserts that she and her surgeon relied on Defendants' alleged misrepresentations regarding the safety and efficacy of using the Infuse Device in an off-label manner, and that she would not have consented to the treatment had she known of its true risks. (*Id.* ¶¶ 39–40).

Based on the foregoing allegations, Plaintiff advances six causes of action against Defendants: (1) fraudulent misrepresentation and fraud in the inducement (Compl. ¶¶ 265–78); (2) strict products liability—failure to warn (*id.* ¶¶ 280–97); (3) strict products liability—design defect (*id.* ¶¶ 299–307); (4) strict products liability—misrepresentation (*id.* ¶¶ 309–21); (5) products liability—negligence (*id.* ¶¶ 323–37); and (6) breach of express warranty (*id.* ¶¶ 339–48).

## III. LEGAL STANDARD

### A. Rule 12(b)(6) Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the claims stated in the complaint. Fed. R. Civ. Proc. 12(b)(6). Dismissal is proper where there is a " 'lack of a cognizable legal theory' " or " 'the absence of sufficient facts alleged under a cognizable legal theory.' " *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir.2011) (quoting *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1990)). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This determination has two steps.

First, the court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679, 129 S.Ct. 1937. A complaint that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (internal quotation marks omitted). Moreover, "[t]he court need not ... accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.2001) (internal citation omitted). However, well-pleaded factual "[a]llegations in the complaint, together with reasonable inferences therefrom, are assumed to be true for purposes of the motion." *Odom v. Microsoft Corp.*, 486 F.3d 541, 545 (9th Cir.2007).

Second, the court must address whether the well-pleaded facts, and reasonable inferences therefrom, give rise to a plausible claim for relief. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

### B. Rule 9(b) Legal Standard

Claims for fraud must overcome the heightened pleading requirements of Rule 9(b). Fed.R.Civ.P. 9(b). Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). When pleading fraud, a complaint must "be 'specific enough to give defendants notice of

the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong.'" *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir.2009) (quoting *Bly–Magee v. California,* 236 F.3d 1014, 1019 (9th Cir.2001)). The complaint must include an account of the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Edwards v. Marin Park, Inc.,* 356 F.3d 1058, 1066 (9th Cir.2004) (citation omitted). In addition, "[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false." *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994) (en banc), *superceded by statute on other grounds.* Further, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations ... and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG LLP,* 476 F.3d 756, 764–65 (9th Cir.2007) (citation and quotation omitted).

## IV. DISCUSSION

Defendants argue that Plaintiff's state law claims are expressly preempted by the MDA, 21 U.S.C. § 360k(a), or in the alternative, impliedly preempted by 21 U.S.C. § 337(a). Defendants further argue that Plaintiff's strict liability design defect claim, breach of warranty claim, and fraud-based claims must be dismissed on independent grounds. Before addressing these arguments, the Court briefly reviews the relevant legal framework under the MDA.

### A. MDA Background

Before 1976, states were left to regulate the entry of new medical devices. *Perez v. Nidek Co., Ltd.,* 711 F.3d 1109, 1117 (9th Cir.2013). In 1976, Congress enacted the MDA, which "swept back some state obli-

gations and imposed a regime of detailed federal oversight" of medical devices. *Riegel v. Medtronic, Inc.,* 552 U.S. 312, 316, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008).

The MDA established a "rigorous process" of premarket approval for new Class III devices, such as the subject device in this case. *Riegel,* 552 U.S. at 316–17, 128 S.Ct. 999. To obtain premarket approval ("PMA"), a manufacturer must submit detailed studies and investigations of the device's safety and effectiveness, and a full description of the device's components and how it may be used. *Id.* at 318, 128 S.Ct. 999.

> The FDA spends an average of 1,200 hours reviewing each application, and grants premarket approval only if it finds there is a "reasonable assurance" of the device's "safety and effectiveness," § 360e(d). The agency must "weig[h] any probable benefit to health from the use of the device against any probable risk of injury or illness from such use." § 360c(a)(2)(C). It may thus approve devices that present great risks if they nonetheless offer great benefits in light of available alternatives.
>
> ...
>
> The premarket approval process includes review of the device's proposed labeling. The FDA evaluates safety and effectiveness under the conditions of use set forth on the label, § 360c(a)(2)(B), and must determine that the proposed labeling is neither false nor misleading, § 360e(d)(1)(A).

*Id.* After completing its review, the FDA may grant or deny premarket approval. 21 U.S.C. § 360e(d).

### B. Federal Preemption Law Under MDA

#### 1. Express Preemption

The MDA contains an express preemption provision that provides, with an exception not applicable here, that:

[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a).

■ In *Riegel,* the Supreme Court applied a two-step analysis to determine whether the MDA expressly preempts a state law claim within the meaning of § 360k(a). First, a court must determine whether the FDA has established requirements applicable to the particular medical device at issue. 552 U.S. at 321, 128 S.Ct. 999. If so, a court must determine whether the state law claims are based on state requirements that are "different from, or in addition to" the federal requirements, and relate to safety and effectiveness. *Id.* at 321–22, 128 S.Ct. 999.

State "requirements" include the state's common-law legal duties. *Riegel,* 552 U.S. at 324–25, 128 S.Ct. 999 ("State tort law . . . disrupts the federal scheme no less than state regulatory law to the same effect."). However, the Supreme Court has made clear that " § 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case 'parallel,' rather than add to, federal requirements." *Riegel,* 552 U.S. at 330, 128 S.Ct. 999; *see also Stengel v. Medtronic, Inc.,* 704 F.3d 1224, 1228 (9th Cir.2013) (en banc) ("[T]he MDA does not preempt a state-law claim for violating a state-law duty that parallels a federal-law duty under the MDA.").

The Eleventh Circuit also has shed light on the meaning of parallel requirements:

In order for a state requirement to be parallel to a federal requirement, and thus not expressly preempted under § 360k(a), the plaintiff must show that the requirements are "genuinely equivalent." State and federal requirements are not genuinely equivalent if a manufacturer could be held liable under the state law without having violated the federal law.

*Wolicki–Gables v. Arrow Int'l, Inc.,* 634 F.3d 1296, 1300 (11th Cir.2011) (quoting *McMullen v. Medtronic, Inc.,* 421 F.3d 482, 489 (7th Cir.2005)) (emphasis in original).

■ "To properly plead parallel claims that survive preemption, a plaintiff must allege facts (1) showing an alleged violation of FDA regulations or requirements related to [the device], and (2) establishing a causal nexus between the alleged injury and the violation." *Erickson v. Boston Scientific Corp.,* 846 F.Supp.2d 1085, 1092 (C.D.Cal.2011) (internal quotation marks omitted); *see also Simmons v. Boston Scientific Corp.,* No. CV 12–7962, 2013 WL 1207421, at *4 (C.D.Cal. Mar. 25, 2013) ("[A] plaintiff must allege that the defendant violated a particular federal specification referring to the device at issue, or identify specific PMA requirements that have been violated." (internal citations and quotation marks omitted)).

Thus, in *Stengel,* an en banc panel of the Ninth Circuit held that the plaintiffs' proposed negligence claim for failure to report adverse events *to the FDA* was not preempted "insofar as the state-law duty parallels a federal-law duty under the MDA." 704 F.3d at 1233. As the court explained, FDA regulations *required* the manufacturer to file an adverse event report with the FDA if it learned of information "reasonably suggest[ing]" that its device "[m]ay have caused or contributed to a death or serious injury." 21 C.F.R.

§ 803.50(a). Thus, the state law duty was "parallel" to the federal requirement. However, a concurring opinion of seven judges took care to note that "had the plaintiffs predicated their claim on a failure to warn *doctors* directly—an action not required by FDA regulations—that claim would have been preempted because it would have been an addition to the federal requirement." *Perez*, 711 F.3d at 1118 (emphasis added) (citing *Stengel*, 704 F.3d at 1234 (Watford, J., concurring)). *See also Hughes v. Boston Scientific Corp.*, 631 F.3d 762 (5th Cir.2011) (negligence claim survived express preemption because premised on defendant's failure to accurately report serious injuries and malfunctions of Class III device as required by FDA regulations); *Bausch v. Stryker Corp.*, 630 F.3d 546, 553 (7th Cir.2010) (negligence claims survived express preemption where premised on a defendant's failure to abide by the FDA's approved product specifications).

### 2. Implied Preemption

The MDA also provides that all actions to enforce FDA requirements "shall be by and in the name of the United States." 21 U.S.C. § 337(a). The Supreme Court interpreted § 337(a) in *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), and concluded that the provision "leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with the medical device provisions." *Id.* at 349 n. 4, 121 S.Ct. 1012. In *Buckman*, "the plaintiffs asserted a state law fraud claim based on purported misrepresentations made to the FDA during the premarket approval process for the medical device at issue." *Stengel*, 704 F.3d at 1235 (citing *Buckman*, 531 U.S. at 343, 121 S.Ct. 1012). "The Supreme Court held that this claim was impliedly preempted because it sought to enforce an exclusively federal requirement and was not grounded in traditional

state tort law." *Id.* (citing *Buckman*, 531 U.S. at 352–53, 121 S.Ct. 1012). Permitting such a result, the *Buckman* court reasoned, would interfere "with the federal statutory scheme, which 'amply empowers the FDA to punish and deter fraud against the Administration.'" 531 U.S. at 348, 121 S.Ct. 1012. Thus, a state law claim is impliedly preempted where it "exist[s] solely by virtue" of federal requirements. *Id.* at 353, 121 S.Ct. 1012.

> This does not mean ... that a plaintiff can never bring a state-law claim based on conduct that violates the FDCA. Indeed ... the conduct on which the plaintiff's claim is premised must violate the FDCA if the claim is to escape express preemption by § 360k(a). Instead, to avoid being impliedly preempted under *Buckman*, a claim must rely[ ] on traditional state tort law which had predated the federal enactments in question[ ]. In other words, *the conduct on which the claim is premised must be the type of conduct that would traditionally give rise to liability under state law—and that would give rise to liability under state law even if the FDCA had never been enacted.* If the defendant's conduct is not of this type, then the plaintiff is effectively suing for a violation of the FDCA (no matter how the plaintiff labels the claim), and the plaintiff's claim is thus impliedly preempted under *Buckman*.

*Riley v. Cordis Corp.*, 625 F.Supp.2d 769, 776–77 (D.Minn.2009) (internal quotations and citations omitted) (emphasis added).

### C. MDA Preemption Analysis

#### 1. First Step of Riegel

The Court begins by addressing Defendants' contention that Plaintiff's claims are expressly preempted. The first prong of the *Riegel* test—whether the FDA has established requirements for the subject device—is clearly met. In *Riegel*, the Su-

preme Court held that § 360k(a) expressly preempted common-law claims challenging the safety and effectiveness of a Class III catheter that had received premarket approval from the FDA. With respect to the first prong, the Court determined that "[p]remarket approval ... imposes 'requirements' under the MDA." 552 U.S. at 322, 128 S.Ct. 999. "Unlike general labeling duties," the Court noted, "premarket approval is specific to individual devices." *Id.* at 323, 128 S.Ct. 999. Further, "the FDA requires a device that has received premarket approval to be made with almost no deviations from the specifications in its approval application, for the reason that the FDA has determined that the approved form provides a reasonable assurance of safety and effectiveness." *Id.* This was sufficient to show that the FDCA imposed federal requirements on the device.

▮ Likewise here, the Infuse Device, also a Class III device, has been subjected to the same "rigorous" premarket approval regime described above. The subject device was approved by the FDA on July 2, 2002, and received supplemental review and approval thereafter. As *Riegel* concluded, such premarket approval imposes federal requirements that are specific to the device and which constitute "federal safety review." *Id.* at 322–23, 128 S.Ct. 999. Thus, specific federal requirements apply to the Infuse Device.

Plaintiff objects that the first step of *Riegel* is not met because the "particular

medical device" at issue here is only the InFUSE™ Bone Graft used alone in her surgery. Plaintiff argues that the PMA process for the Infuse Device only establishes federal requirements for the InFUSE™ Bone Graft used in conjunction with the LT–Cage™, but not the InFUSE™ Bone Graft used alone. Therefore, in Plaintiff's view, no federal requirements apply to the particular medical device that is the object of her lawsuit.

This argument misses the mark. Section 360k(a) broadly preempts any state requirement *"with respect to"* a particular device, as long as the state requirement is (1) "different from, or in addition to" any federal requirement "applicable ... to the device," and (2) relates to the "safety or effectiveness of the device or to any other matter included in a requirement applicable to the device." Here, Plaintiff's state law claims are bottomed, inter alia, on (1) Defendants' alleged misrepresentations while promoting off-label uses of the Infuse Device, and (2) Defendants' failure to warn of the risks of off-label uses of the Infuse Device, a device which Plaintiff implicitly concedes is subject to federal strictures. Thus, even though Plaintiff was not implanted with the Infuse Device in an approved manner, her state claims are oriented "with respect to" the off-label promotion and use of a device that is covered by federal requirements. This suffices to bring her state law claims within the ambit of express preemption under *Riegel*.[5]

---

**5.** Further, Plaintiff's argument is foreclosed by *Perez*. There, the plaintiffs underwent an eye surgery that used a Class III laser device in an off-label manner, namely to correct farsightedness. The plaintiffs sued the laser manufacturer for failing to disclose that, at the time of the procedure, the FDA had not approved the covered device for this use. The Ninth Circuit held that the state law claims were expressly preempted because they sought to introduce a requirement "in addi-

tion to" federal requirements for the covered device: that physicians and manufacturers "must affirmatively tell patients when medical devices have not been approved for a certain use." *Perez*, 711 F.3d at 1118–19. In so holding, the Ninth Circuit implicitly recognized that the first step of *Riegel* was met because the state law claims stood "with respect to" a covered device, even though the case concerned an off-label use of that device.

### 2. Second Step of Riegel

Having resolved the first step, the Court turns to the central inquiry: whether Plaintiff's state law claims are based on "any requirement" of California law that is "different from, or additional to" federal requirements applicable to the Infuse Device, and that "relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device." § 360k(a). It is undisputed that safety and effectiveness are the prime concerns of Plaintiff's claims, so the key issue is whether California's laws impose duties different from or additional to the federal ones. Because Plaintiff's state law claims proceed on distinct legal theories, the Court addresses them separately.[6]

#### i. Strict Products Liability— Failure to Warn [7]

■ Plaintiff's failure to warn claim asserts generally that Defendants failed to warn Plaintiff and her physicians of the dangers of using the Infuse Device in an off-label manner. (Compl. ¶ 280). Plaintiff further alleges that "the warnings accompanying the Infuse® product did not adequately warn Plaintiff and Plaintiff's physicians ... of the dangers associated with Infuse® when used without an LTCage and placed posteriorly or laterally in a lumbar spine fusion surgery," and "failed to provide the level of information that an ordinary physician or consumer would expect." (Compl. ¶¶ 284–85).

The Court concludes that Plaintiff's strict products liability failure to warn claim is expressly preempted by the MDA.

For Plaintiff to prevail, a jury would have to find either that Defendants were required to include warnings beyond those in the FDA-approved label for the Infuse Device, or that Defendants were obligated to issue post-sale warnings about potential adverse effects of using the Infuse Device in an off-label manner. While FDA regulations *permit* Defendants to issue such post-sale warnings, those regulations do not require such warnings. *See Stengel,* 704 F.3d at 1234 (Watford, J., concurring) (citing 21 C.F.R. § 814.39(d)). In either case, Plaintiff aims to foist upon Defendants labeling or warning requirements "in addition to" what federal law requires. Therefore, the claim is expressly preempted.

#### ii. Strict Products Liability— Design Defect

■ Plaintiff's design defect claim alleges that the Infuse Device was "defectively designed at the time that it left the Defendants' control" because "the design was unsafe when used in the manner promoted by Defendants," and because "the risks of danger in the design outweigh the benefits of the design." (Compl. ¶¶ 299–301). In other words, this claim attacks "the risk/benefit analysis that led the FDA to approve an inherently dangerous Class III device. Such claims are expressly preempted by § 360k." *Bryant v. Medtronic, Inc.,* 623 F.3d 1200, 1206 (8th Cir. 2010); *Mitchell v. Collagen Corp.,* 126 F.3d 902, 913–14 (7th Cir.1997), *cert. denied,* 523 U.S. 1020, 118 S.Ct. 1300, 140 L.Ed.2d 467 (1998) (strict liability claim that product

---

6. In her opposition, Plaintiff alludes to "her claim based on Medtronic's failure to report adverse events to the FDA is akin to the state torts of negligence and failure to warn." (Opp. at 12, 17–18). In reviewing the Complaint, however, the Court has not detected any cause of action premised on an FDA violation concerning the failure to report adverse events to the FDA.

7. Plaintiff suggests in her opposition that her strict products liability—failure to warn claim is akin to the claim alleged in *Riley v. Cordis Corp.,* 625 F.Supp.2d 769 (D.Minn.2009), where the plaintiff alleged that while defendants were engaged in off-label promotion of a Class III medical device, they failed to warn plaintiffs of foreseeable dangers of that use. As the allegations recited herein show, the Complaint does not allege such a claim.

was "unreasonably dangerous" was expressly preempted because it conflicted with FDA premarket approval of the product); *see also Riegel,* 552 U.S. at 325, 128 S.Ct. 999 ("State tort law that requires a manufacturer's [Class III device] to be safer, but hence less effective, than the model the FDA has approved disrupts the federal scheme.").

### iii. Products Liability—Negligence

Plaintiff's negligence claim asserts that Defendants breached their duties to Plaintiff in four respects: (1) improper promotion and marketing of the Infuse Device to physicians, including for off-label uses; (2) failure to warn physicians and Plaintiff of dangers associated with off-label uses of the Infuse Device; (3) failure to exercise reasonable care by not complying with federal law and regulations applicable to the sale and marketing of the Infuse Device; and (4) failing to exercise reasonable care to prevent the subject device from creating an unreasonable risk of harm to Plaintiff. (Compl. ¶ 329).

 First, any negligence claim based solely on illegal off-label promotion is impliedly preempted under *Buckman* and § 337(a). Like the "fraud on the FDA" claim in *Buckman,* the instant claim that Defendants engaged in illegal off-label marketing of the Infuse Device "exist[s] solely by virtue" of federal regulations, and is not rooted in any traditional state tort law. Permitting this claim to proceed would essentially allow a private litigant to attempt to enforce the FDCA. Such a claim is impliedly preempted under *Buckman. Cf. Perez,* 711 F.3d at 1119–20 (fraud by omission claim impliedly preempted because premised on defendant's non-disclosure concerning scope of FDA's premarket approval).

 Second, to the extent Plaintiff's negligence claim is premised on a failure to warn or dangerous design (Grounds 2 and 4), the claim is expressly preempted for the same reasons that the preceding strict products liability claims are preempted: these claims proceed on the theory that state law required Defendants to issue warnings about the risks of off-label uses, or make cost-benefit decisions about the device design, "different from" or "in addition to" what applicable federal requirements demand.

 Third, to the extent Plaintiff anchors her negligence claim in some other violation of federal law, Plaintiff has not alleged sufficient facts to establish a parallel claim that avoids express preemption. Plaintiff "cannot simply incant the magic words '[Defendant] violated FDA regulations' in order to avoid preemption." *Wolicki–Gables v. Arrow Int'l, Inc.,* 634 F.3d 1296, 1301 (11th Cir.2011). Rather, Plaintiff must allege facts to substantiate that Defendants violated a particular federal requirement applicable to the subject device. *Simmons,* 2013 WL 1207421, at *4. The vague allegation that Defendants violated federal law is "insufficient to overcome the preemptive reach of § 360k(a)." *Caplinger v. Medtronic, Inc.,* 921 F.Supp.2d 1206, 1224 (W.D.Okla.2013).

Accordingly, Plaintiff's negligence claim must be dismissed.

### iv. Fraud–Based Claims—Fraudulent Misrepresentation, Fraud in the Inducement, Strict Products Liability (Misrepresentation)

Plaintiff's claims for fraudulent misrepresentation and fraud in the inducement alleges that "Defendants fraudulently and intentionally misrepresented material and important health and safety product risk information from [sic] Plaintiff and Plaintiff's physicians." (Compl. ¶ 265). Plaintiff further alleges the following grounds for this claim:

a. The MEDTRONIC Defendants fraudulently concealed and misrepresented the health and safety haz-

ards, symptoms, constellation of symptoms, diseases and/or health problems associated with the off-label posterior-approach use of Infuse;

b. The MEDTRONIC Defendants fraudulently concealed and misrepresented their practice of promoting and marketing to physicians, including Plaintiff's physician, the off-label practice of using of Infuse without an LT–Cage and placing it posteriorly or laterally;

c. The MEDTRONIC Defendants fraudulently concealed and misrepresented information about the known comparative risks and benefits of the use of Infuse and the relative benefits and availability of alternate products, treatments and/or therapies.

(*Id.* ¶ 267).

Similarly, Plaintiff's claim for strict products liability/misrepresentation alleges that "[i]n the course of marketing Infuse, the MEDTRONIC Defendants made untrue representations of material facts and omitted material information to Plaintiff, Plaintiff's physicians, and the public at large. The MEDTRONIC Defendants sponsored biased medical trials, reports, and articles that wrongfully and inaccurately claimed that the dangers inherent to off-label use of Infuse did not exist or were significantly less than the actual dangers." (*Id.* ¶ 310). In short, the gravamen of Plaintiff's allegations is that Defendants, in the course of promoting off-label uses of the Infuse Device, fraudulently omitted or misrepresented material facts to Plaintiff and her physician, and that Plaintiff and

her physician would not have decided to proceed with the off-label use of the Infuse Device had they known such material facts.

▇▇▇▇ Leaving aside Rule 9(b) for the moment, the Court concludes that Plaintiff's fraud-based claims could escape both express and implied preemption. As an initial matter, Plaintiff's fraudulent advertising claims are not impliedly preempted under *Buckman* because they are moored in traditional state common law that exists independently from the FDCA. With respect to express preemption, Plaintiff's claim that Defendants made fraudulent statements to promote off-label uses of the Infuse Device lies "parallel" to federal requirements. First, although federal law permits Defendants to engage in advertising beyond the subject device's label, it requires that such representations not be false or misleading.[8] Second, federal regulations prohibit device manufacturers from promoting off-label uses of medical devices. *See, e.g., Carson v. Depuy Spine, Inc.,* 365 Fed.Appx. 812, 815 (9th Cir.2010) ("[W]hile doctors may use a drug or device off-label, the marketing and promotion of a Class III device for an unapproved use violates Section 331 of the FDCA."); *cf. In re Epogen & Aranesp Off–Label Marketing & Sales Practices Litigation,* 590 F.Supp.2d 1282, 1287 (C.D.Cal.2008) ("Under FDA regulations, drug manufacturers are prohibited from promoting off-label uses of prescription drugs."). In sum, federal law forbids device manufacturers to promote any off-label uses, and certainly prohibits false or misleading off-label promotion. Against this backdrop, Plaintiff's fraud claims are parallel or "genuinely

---

**8.** To explain, the Infuse Device is a "restricted device" within the meaning of 21 U.S.C. §§ 360e(d)(1)(B)(ii), 360j(e). (PMA at 1). A restricted device is deemed "misbranded," and its entry into commerce is prohibited, if its advertising is false or misleading in any particular. 21 U.S.C. §§ 331(a), 352(q)(1).

Consistent with this rule, the PMA for the Infuse Device requires that the sale and distribution of the device must not involve misbranding, (PMA at 1), and federal regulations require that the device be advertised in conformity with the PMA, 21 C.F.R. § 814.80.

equivalent" to federal law because there is no likelihood that Defendants could be held liable under state law without having violated the federal law. *Wolicki–Gables,* 634 F.3d at 1300. Accordingly, the Court concludes that Plaintiff's fraud-based claims, if adequately pled, would not be federally preempted. *See also In re Epogen,* 590 F.Supp.2d at 1291 (holding that state consumer fraud claims based on defendant's alleged fraudulent statements made to promote off-label uses were not preempted by the FDCA).[9]

Although the Court has concluded that Plaintiff's fraud-based claims are not susceptible to preemption, these claims must nevertheless be dismissed because Plaintiff has not plead them with the particularity required by Rule 9(b). Plaintiff has alleged generally that Defendants misrepresented the safety of the Infuse Device to physicians and patients. But the Complaint fails to allege the specific contents of those representations, when and where Defendants allegedly made them, and to whom they were made. Nor has Plaintiff alleged which parts of the misrepresentations were misleading, and *why* they are false. Accordingly, the claim must be dismissed.

*v. Breach of Express Warranty*

Plaintiff alleges that Defendants "utilized journal articles, advertising media, sales representatives/consultants and paid Key Opinion Leaders to urge the use, purchase, and utilization of the off-label use of Infuse Bone Graft and expressly warranted to physicians and other members of the general public and medical community that such off-label uses, including uses in lumbar fusion procedures, were safe and effective." (Compl. ¶ 339). Plaintiff further alleges that "her treating surgeon relied on Defendants' express warranty representations regarding the safety and efficacy of off-label use of Infuse, but such off-label uses, including uses in lumbar fusion procedures, were not effective, safe, and proper for the use as warranted in that Infuse was dangerous when put to these promoted uses." (*Id.* ¶ 341).

The Court concludes that Plaintiff's breach of express warranty claim is not expressly preempted because it would not impose any requirement different from or in addition to what federal law demands.[10] As discussed in the preceding section, fed-

9. One could argue that because federal law outlaws *all* off-label promotion, a state law requirement that outlaws only *misleading* off-label promotion would be literally "different from" federal law. However, even if it is necessary under state law to prove an extra element—i.e., that the off-label promotion was misleading—this additional element would make the state requirements *narrower,* not broader, than the federal requirement. "While such a narrower requirement might be 'different from' the federal rules in a literal sense, such a difference would surely provide a strange reason for finding pre-emption of a state rule insofar as it duplicates the federal rule." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 495, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (holding state law negligence claims were not "different from" federal law "even if it may

be necessary as a matter of Florida law to prove that those violations were the result of negligent conduct"). Moreover, "[t]he presence of a damages remedy does not amount to the additional or different 'requirement' that is necessary under the statute; rather, it merely provides another reason for manufacturers to comply with identical existing 'requirements' under federal law." *Id.* Accordingly, these considerations do not alter the Court's conclusion.

10. The Court notes that Plaintiff's warranty claim is *not* based on the contents of the Infuse Device's FDA-approved label. Thus, if Plaintiff were to prevail on this claim, Defendants would not be compelled by state law to do anything "different from" or "in addition to" with respect to the subject device's label. Rather, Plaintiff's claim is premised on out-

eral law already prohibits false or misleading off-label promotion. Therefore, to the extent that Plaintiff seeks to impose liability on Defendants for voluntarily making misleading warranties outside the label, Plaintiff is not imposing any requirement different from or additional to what federal law already requires.[11] In other words, to avoid state law liability on this claim, Defendants need only to refrain from making misleading warranties, which adds no burden beyond what federal law already imposes. Nor is the express warranty claim impliedly preempted under *Buckman,* as a claim for express breach of warranty finds its origin in traditional state law that predates the FDCA.

■■■■■ Although the express warranty claim is not federally preempted, Plaintiff has not alleged sufficient facts for the claim to survive dismissal under Rule 8. Under California law, to state a claim for breach of express warranty, Plaintiff must allege that the seller: "(1) made an affirmation of fact or promise or provided a description of its goods; (2) the promise or description formed the basis of the bargain; (3) the express warranty was breached; and (4) the breach caused injury to the plaintiff." *Keegan v. Am. Honda Motor Co., Inc.,* 838 F.Supp.2d 929, 949 (C.D.Cal.2012) (internal citation and quotation marks omitted). Plaintiff has alleged

no facts demonstrating that Defendants made any affirmations specifically to Plaintiff or her physician so as to form the basis of the bargain.

■■■ Moreover, to state a claim for breach of express warranty, a buyer must plead that notice of the alleged breach was provided to the seller within a reasonable time after discovery of the breach. *See Alvarez v. Chevron Corp.,* 656 F.3d 925, 932 (9th Cir.2011) (internal citations omitted). Thus, Plaintiff's claim fails for the additional reason that she has failed to allege that she gave any notice of the alleged breach to Defendants within a reasonable time after discovering the breach and prior to filing suit. The claim therefore must be dismissed.

## V. CONCLUSION

For the foregoing reasons, the motion to dismiss the Complaint (Dkt. 16) is GRANTED with leave to amend.[12] Plaintiff may file an amended complaint within thirty days of the date of this order. Failure to file an amended complaint by this deadline will result in dismissal of the action without prejudice.

IT IS SO ORDERED.

---

side warranties allegedly made by Defendants in the course of advertising the Infuse Device's off-label uses.

**11.** The Eighth Circuit's decision in *Bryant* is distinguishable. 623 F.3d at 1207–1208. There, the plaintiff alleged that the use of the device in an approved manner gave rise to a breach of the express warranties found *on the label.* Thus, the court reasoned that to prevail on the claim, "Plaintiffs must persuade a jury that [the devices] were not safe and effective, a finding that would be contrary to the FDA's approval of the PMA Supplement." *Id.* at 1208. Here, in contrast, Plaintiff alleges that an off-label use of the Infuse Device did

not live up to off-label warranties made by Defendants. Therefore, a plaintiff's verdict would not require any finding contrary to what the FDA has approved.

**12.** Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *De-Soto v. Yellow Freight Sys., Inc.,* 957 F.2d 655, 658 (9th Cir.1992) (quoting *Schreiber Distrib. Co. v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986)). The Court cannot conclude at this time that amendment of Plaintiff's pleadings would be futile.